**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                            )
**FRANCESCA RECORDS and JOHN W.**           )
**GEILS, JR.,**                             )
                                            )
            **Plaintiffs,**                 )        **Civil Action No.**
                                            )        **12-11419-FDS**
            **v.**                          )
                                            )
**GEILS UNLIMITED RESEARCH, LLC;**          )
**T&A RESEARCH & DEVELOPMENT**              )
**CORP.; GEILS REUNION; NICK**              )
**BEN-MEIR; SETH JUSTMAN; DANIEL**          )
**KLEIN; RICHARD SALWITZ; and PETER**       )
**BLANKFIELD, a/k/a PETER WOLF,**           )
                                            )
                                            )
            **Defendants.**                 )
_____ )


**MEMORANDUM AND ORDER**
**ON DEFENDANTS' MOTION TO DISMISS**

**SAYLOR, J.**

This action arises out of a dispute over the rights to the name of a famous rock band.

The J. Geils Band was formed in the late 1960s and rose to commercial success beginning in the

1970s.  One of the band members, John W. Geils, Jr., has had a falling out with the other

members of the band, and a dispute has arisen as to who owns the trademarks  GEILS, J. GEILS,

JAY GEILS, and J. GEILS BAND.

Both Geils and Francesca Records, his record label as a solo artist, contend that they own

the trademarks.  They have brought this action against the remaining members of the band, the

band's manager, and the entities that manage the band's reunion performances.  Defendants are

the four remaining members of the band (Seth Justman, Daniel Klein, Richard Salwitz, and Peter

Blankfield, a/k/a Peter Wolf); the band's manager (Nick Ben-Meir); T&A Research &

Development Corporation (an entity created by the band in the 1970s); Geils Unlimited

Research, LLC (an entity formed in 2012 for the purposes of a reunion tour); and Geils Reunion

(a partnership through which the band organized performances in 1999 and 2009 through 2011).

Defendants contend that they own the trademarks pursuant to an agreement entered into in 1982.

Plaintiffs seek declaratory judgments that they are the sole owners of the trademarks, that

the 1982 agreement is invalid or unenforceable, and that T&A is not a valid corporation.

Plaintiffs also bring claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114,

against defendants T&A and Geils Unlimited; unfair and deceptive business practices under

Mass. Gen. Laws ch. 93A against all defendants; tortious interference against T&A; and breach

of fiduciary duty against the individual defendants.  Plaintiffs also seek an accounting against

defendants T&A and Geils Reunion.

Defendants have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6),

12(b)(1) and 9(b).  Defendants contend that the complaint does not satisfy the heightened

pleading requirements for coercion in a contract dispute and fails to state a federal trademark

claim upon which relief can be granted.  Defendants further contend that because plaintiffs'

federal claims fail, the Court lacks subject-matter jurisdiction over the case and therefore must

dismiss all of the supplemental state law claims under Fed. R. Civ. P. 12(b)(1).

In simple terms, the issue before the Court is whether the complaint is so deficient that it

must be dismissed under Rules 9 and 12.  For the reasons set forth below, the motion to dismiss

will be denied.

I.      **Background**

Unless otherwise noted, the facts are set forth as alleged in the complaint.  The Court also

refers to facts and documents that are incorporated by reference in the complaint, as well as

matters of public record.

John W. Geils, Jr., has, since birth, been known as either "Jay Geils" or, since the

beginning of his professional music career in 1967, simply "J. Geils."  (Compl. ¶ 17).  In 1966, J.

Geils (guitar), Richard Salwitz (harmonica), and Danny Klein (bass) started performing together

in a band known as "Snoopy and the Sopwith Camels."  Geils was the band's leader.  (*Id.* at ¶¶

19-21).  By 1967, the band had become known as the "J. Geils Blues Band" or the "J. Geils

Band."  (*Id.* at ¶ 25).   In late 1967 and early 1968, the band played shows at various locations

around Massachusetts.  (*Id.* at ¶ 27).

In 1968, Stephen Bladd (drums), Seth Justman (organ), and Peter Wolf (vocals) joined

the band.  (*Id.* at ¶ 29).  The band's popularity grew, and in 1970 they signed a contract with

Atlantic Records.  Their debut self-titled album was released later that year and included the hit

singles "Looking for a Love" and "First I Look at the Purse."  (*See id.* at ¶¶ 34-37).

The band released its second album, *The Morning After*, in 1971, and recorded their first

live album, *Full House*, the following spring at the Cinderella Ballroom in Detroit.   (*Id.* at ¶¶

40-41).  In April 1973, the band released the album *Bloodshot*, which ultimately climbed to #10

on the Billboard charts.  (*Id.* at ¶ 45).

In the summer of 1973, Geils, Salwitz, Klein, Bladd, Justman, and Wolf formed a

corporation called T&A Research and Development Corp.  The purpose of the entity was to

manage the J. Geils Band's royalties and revenues, with each bandmember receiving an equal

number of shares and equal voting rights.  (*Id.* at ¶ 42).

The J. Geils Band went on to release a number of other albums in the 1970s, including *Ladies Invited* (1973), *Nightmares . . . and Other Tales from the Vinyl Jungle* (1974), *Hotline* (1975), *Blow Your Face Out* (1976), *Monkey Island* (1977), *Sanctuary* (1978) and *Best of the J. Geils Band* (1979).  (*Id.* at ¶ 45).

The band enjoyed its greatest commercial success in the early 1980s.  In 1980, the band released the album *Love Stinks*, which included the hit singles "Just Can't Wait," "Come Back," and "Love Stinks."  It ultimately reached #18 on the Billboard charts.  Then, after releasing the less successful, *Anthology: Houseparty*, the band released the hugely successful *Freeze-Frame* in 1981.  *Freeze-Frame* featured the band's first #1 hit single, "Centerfold," and the album eventually went platinum.  (*Id.* at ¶ 47-48).

Later in 1981, Geils informed the other band members that he intended to leave the band. They were all upset, especially Wolf, and ultimately convinced him to stay.  (*Id.* at ¶ 49).

In 1982, Wolf and Justman hired attorney Abraham Somer to draft a document styled as a shareholder's agreement for T&A.  On September 10, 1982, Geils, Salwitz, Klein, Bladd, Justman, and Wolf met with Somer at the Ritz-Carlton Hotel in Boston to sign the agreement. (*See id.* at ¶¶ 52-54 ).  Geils alleges that he was not given an opportunity to consult with his own attorney before the meeting; that he was not given the opportunity to negotiate the terms of the agreement; and that he was forced under extreme pressure to sign it.  (*Id.* at ¶¶ 62-63).  The shareholder agreement, which was a typed document, was further modified by hand on the day that it was signed.  Geils alleges that he was likewise forced to accept these modifications.  (*Id.* at  ¶ 60).

The shareholder agreement  provided, in relevant part, as follows (italicized text indicates a handwritten modification):

    (a) No Shareholder shall have the right (i) to use the name "The J. Geils Band" or the name "J. Geils" or any other name containing the word "Geils" or any name confusingly similar to any of such names (all such names being sometime herein-after collectively referred to as the "Name") as the name of a musical group or otherwise for any commercial purpose on or in connection with any commercial venue or (ii) to receive any compensation or other consideration derived from any such use, except in connection with such Shareholder's activities in the entertainment field as a member of a musical group using the Name and comprised of all the Shareholders who are parties hereto or as set forth in the following provisions of this paragraph 6.

    (b) (i)  If Peter Wolf and Seth Justman shall perform together as a musical group (whether alone or together with other individuals), they, together with such Shareholders, if any, who may also perform with them as a part of such musical group, shall have the right (i) to use the Name as the name of their musical group and for any commercial purpose and in connection with any commercial venture related to such musical group and (ii) to retain for their own account any compensation or other consideration derived from their such use and no other Shareholder who is not performing with Peter Wolf and Seth Justman as a member of such musical group shall have any right whatsoever (i) to use the Name as the name of a musical group or otherwise for any commercial purpose or in connection with any commercial venture or (ii) to receive any compensation or other consideration derived from the use of the Name.

    (ii)      If Peter Wolf and Seth Justman shall cease to perform together as a musical group, then Peter Wolf and Seth Justman shall determine by mutual agreement which, if either of them, shall be entitled to use the Name as the name of his musical group and the one so determined to be*entitled* to use the Name as the name of his musical group shall have the same rights with respect to his use of the Name as Peter Wolf and Seth Justman performing together are accorded pursuant to subparagraph 6(b)(i) above. If Peter Wolf and Seth Justman are unable mutually to determine which of them shall be entitled so to use the Name, then such dispute shall be resolved by a vote of all the Shareholders, in which the votes of a majority of the Shareholders shall be decisive. If there is no majority decision of all the Shareholders, then thereafter until the deadlock is resolved, no Shareholder shall have any right to use the Name as the name of his musical group or otherwise for any commercial purpose or in connection with any commercial venture.

> (iii)     Notwithstanding any of the foregoing if John Geils, Jr. shall cease to perform as a member of a musical group using the Name, then he shall *not* have the right to use the name "J. Geils" or "Geils" in connection with a commercial venture *but shall have the right to use* the names "John Geils" or "John Geils, Jr." in connection with a commercial venture even if related to the music industry (except as the name of any group performing or otherwise rendering services in the entertainment industry) and to retain for his own account all compensation or other consideration derived therefrom.

(*Id.* at ¶¶ 57-59).

By 1983, tensions among the band members had increased significantly.  (*Id.* at ¶ 68). That year, while the band was working on the album *You're Gettin' Even While I'm Gettin' Odd*, Wolf formally quit the J. Geils Band and sold back all of his shares in T&A.  (*Id.* at ¶ 70).  In 1984, Geils, Salwitz, Klein, Bladd and Justman chose not to continue performing together.  (*Id.* at ¶ 70).  T&A remained intact only as a clearinghouse for royalties from the fourteen albums that the J. Geils Band had recorded together.   (*Id.* at ¶ 74).

After the band broke up, Geils pursued a number of other ventures, all under the names "J. Geils" or "Jay Geils."  Among other things, he performed with The Les Paul Trio, Bucky and John Pizzarelli, James Cotton, Duke Robillard, Karrin Allyson, Joe Louis Walker, Huey Lewis, Johnny Winter, and B.B. King.  (*Id.* at ¶¶ 75-76).

In 1992, Geils reunited with Salwitz to form the duo Bluestime.  From 1992 to 2004, Bluestime periodically toured and recorded two albums.  Geils used the name "Jay Geils" on the albums and in marketing materials for Bluestime.  (*Id.* at ¶¶ 77-78).  During that same time, Geils also began performing with Gerry Beaudoin, and identified himself as "J. Geils" or "Jay Geils" for the purposes of such performances.  (*Id.* at ¶¶ 81-82).  According to Geils, defendants were aware of these performances and never objected.  (*Id.* at ¶ 83).

In 1999, Geils, Salwitz, Klein, Bladd, Justman, and Wolf reunited for a J. Geils Band reunion tour, playing thirteen shows to very positive reviews. (*Id.* at ¶¶ 84-85). T&A managed the administration of the reunion tour and the distribution of revenues. (*Id.* at ¶ 86). The full band then reunited a number of other times for isolated shows, including performances at the House of Blues in Boston (2009), the Borgatta Hotel/Casino in Atlantic City (2009), Mohegan Sun in Uncasville, Connecticut (2009), and as the opening act for Aerosmith at Fenway Park in Boston (2010). (*Id.* at ¶ 88).

In 2003, Geils had obtained an ownership interest in Francesca Records, to which he granted (or attempted to grant) his rights, title, and ownership to the J. GEILS BAND trademark. (*See id.* at ¶¶ 98-101). In June 2008, Francesca Records filed an application to register the J. GEILS BAND trademark in Class 25 (apparel) and Class 41 (entertainment); the application listed a date of first use in commerce of December 22, 1967, based upon the first use of the mark by Geils. (*Id.* at ¶ 103). The trademark was registered on December 8, 2009, and given registration number 3,720,699. (*Id.* at ¶ 104).

In 2011, Francesca Records contacted T&A about its continued use of the J. GEILS BAND trademark. (*Id.* at ¶ 105). On November 21, 2011, Gerry Beaudoin received an e-mail from the band's manager, Nick Ben-Meir, stating, in relevant part, "It has come to our attention that the name 'J. Geils' has been trademarked. What J would not tell us is whether the trademarking is for 'J. Geils' or for 'J. Geils Band.' If it is for J's name only then, of course, that is perfectly fine. . . . If, however, you have trademarked the J. Geils Band, then we must advise you that the rights to such a trademark belong to the group as whole, and we would urge you to correct the situation as soon as possible, in order to avoid misunderstandings amongst the

members of the group." (*Id.* at ¶ 106).

On December 27, 2011, attorney Eric Doney sent a cease-and-desist letter to Showcase Live, a performance venue in Foxborough, Massachusetts, contending that the venue had no right to use the name J. Geils or the J. GEILS BAND trademark in connection with an upcoming performance by Geils and Beaudoin.   As a result, Showcase Live cancelled the performance. (*Id.* at ¶¶ 107-08).

On April 13, 2012, T&A filed an application to register the trademark THE J. GEILS BAND, serial number 85597876, in International Classes 9 (musical recordings), 25 (clothing) and 41 (entertainment) and listed a first-use-in-commerce date of 1969.  (*Id.* at ¶¶ 109-10).

On May 31, 2012, attorney James Weinberger sent a cease-and-desist letter to Sweetwater Music Hall and Songkick.com, Inc., about an upcoming performance by Geils.  (*Id.* at ¶¶ 113-14).  The letter contended that the "use of the term J. Geils," including, "The J. Geils Band, J. Geils, and/or J. Geils and Friends" was "unauthorized" as per the 1982 T&A shareholder agreement.  (*Id.* at ¶ 117).  The performance ultimately went forward under the title "Jay Geils and Friends."  (*Id.* at ¶ 119).

On June 4, 2012, Geils received correspondence contending that he was a member of a partnership called Geils Reunion, which was being dissolved at the election of the other partners. (*Id.* at ¶ 89).  Geils contends that he has no recollection of ever entering such a partnership, and maintains that he believed all payments related to the reunion performances were paid through T&A.  (*Id.* at ¶ 90).

According to the complaint, from 1991 to 2012, T&A and its officers and directors failed to file any documents with the State of Delaware or to pay any annual registration fees.  (*Id.* at ¶

8

92).  Furthermore, since its inception in 1973, T&A had never held an annual meeting; held a shareholder meeting; elected directors or officers; or otherwise followed corporate formalities. (*Id.* at ¶ 91).

The other members of the J. Geils Band have ceased communication with Geils about performances and have booked and played a number of reunion shows, as well as made a film appearance, without him.   (*See id.* at ¶¶ 125-132).

## II.      Standard of Review

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom."  *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if plaintiffs' well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief."  *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## III.     Analysis

Typically, the ownership of the trademark rights to the name of a rock band is a complex

issue.  Bands normally start as loose and informal partnerships of young musicians, and legal

formalities tend to be ignored at the outset (and often long thereafter).  However, the question

before the Court at this stage is not who actually owns the rights to the name "J. GEILS BAND"

or "J. GEILS"; the final resolution of that issue will occur at a later stage in the proceeding.

Instead, the question is whether the complaint is so deficient that it must be dismissed for failure

to meet the requirements of Rules 9 and 12.  For the reasons set forth below, the complaint meets

those standards, and accordingly the motion to dismiss will be denied.

A.      **Counts 1, 2, 3, 10, 11, and 14 – Declaratory Judgment as to Trademark and
        Trademark Infringement**

Plaintiffs assert claims for declaratory judgment as to ownership of the trademarks

GEILS, J. GEILS, JAY GEILS, and J. GEILS BAND.  Plaintiffs also assert a trademark

infringement claim under the Lanham Act against defendants T&A and Geils Unlimited.

The use of a declaratory judgment action to establish the ownership of trademark rights is

a long-established practice in the federal court system.  Whether such an action presents a "case

or controversy" within the meaning of Article III of the Constitution has not been settled by the

Supreme Court.  However, every circuit court that has considered the issue has held that the test

articulated by the Supreme Court in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007),

to determine patent rights applies to declaratory judgments concerning trademark rights as well.

*See Blue Ath., Inc. v. Nordstrom, Inc.*, 2010 U.S. Dist. LEXIS 72615 at *9-10 (D.N.H. 2010)

(surveying cases).  Under that analysis, the party seeking a declaratory judgment need not show

a "reasonable anticipation" of an infringement claim, and need only show that "the controversy

between the parties is substantial, the parties plainly have adverse interests, and the controversy

is both immediate and real."  *Id.* at *11 (citing *MedImmune*, 549 U.S. at 127).  Here, the parties'

competing attempts to trademark the J. GEILS BAND mark, along with their concurrent efforts to protect and use it, easily satisfy that standard.

Ownership rights to a trademark arise from the first use of a name in interstate commerce. *Gen Healthcare Ltd. v. Qashat*, 364 F.3d 332, 335 (1st Cir. 2004) ("Trademark rights may arise under either the Lanham Act or under common law, but in either circumstance, the right is conditioned upon use in commerce."). Here, plaintiffs have alleged facts that could support a finding that the first use of the marks at issue was made by John W. Geils, Jr., in 1967.

Defendants contend, however, that even if Geils had the ownership rights to the marks, he transferred those rights to T&A in the 1982 shareholder agreement. Whether that proves to be true or not, plaintiffs' claims cannot be dismissed at this early stage. First, the language of the shareholder agreement does not directly address the ownership rights to the marks. Instead, the relevant provision appears to deal with the shareholders' rights "to *use* the name 'The J. Geils Band' or the name 'J. Geils' or any other name containing the word 'Geils' or any name confusingly similar to any of such names" (emphasis added). This could be read, among other ways, as a license to use the mark, rather than a transfer of the ownership of the mark. Taking plaintiffs' allegations as true, the length and terms of such a license would depend on disputed issues of fact. Furthermore, and as set forth in more detail below, plaintiffs have alleged a number of facts that could render the shareholder agreement inoperable. Accordingly, the motion to dismiss the declaratory judgment claims as to the ownership of the trademarks will be denied

With respect to the trademark infringement claim under the Lanham Act, 15 U.S.C. § 1125(a), plaintiffs must ultimately prove (1) ownership of a distinctive mark entitled to

trademark protection; (2) use of that mark in interstate commerce; and (3) use of the mark by

defendant in a manner likely to cause confusion as to the origin of the goods or services.

*Calamari Fisheries v. The Village Catch*, 698 F. Supp. 994, 1006 (D. Mass. 1988).

Here, plaintiffs have alleged sufficient facts to support a claim that John W. Geils, Jr.,

owns at least some of the marks at issue and made first commercial use of them in 1967.

Therefore, the only remaining element for the infringement claim is likelihood of consumer

confusion.  *See Purolator, Inc. v. EFRA Distribs., Inc.*, 687 F.2d 554, 559 (1st Cir. 1982);

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486-87 (1st Cir.

1981).

Trademark infringement requires more than a theoretical possibility of confusion, but a

substantial likelihood of "confounding an appreciable number of reasonably prudent purchasers

exercising ordinary care."  *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12

(1st Cir. 2008) (internal quotation marks omitted).  However, it is also true that where a

trademark holder has authorized another to use its mark, there can be no likelihood of confusion

and no violation of the Lanham Act, provided the alleged infringer uses the mark as authorized.

*See ITOFCA, Inc. v. MegaTrans Logistics, Inc.,* 322 F.3d 928, 940 (7th Cir.2003) ("A licensee

infringes . . . if its use exceeds the scope of its license.").

The complaint here alleges facts that (if believed) would support a likelihood of

consumer confusion.  Geils contends that he never granted a license to Geils Unlimited to use the

marks, and that he effectively revoked any license for T&A to use the marks in 2011.  According

to plaintiffs, T&A and Geils Unlimited have nonetheless continued to use the marks to promote

performances of the J. Geils Band that neither involved Geils nor were authorized by him.  The

complaint alleges that a consumer would expect Geils to be part of a performance of the J. Geils

Band.  Furthermore, plaintiffs allege that defendants, through their attorneys, caused Geils to

forgo at least one performance and change the name of his act for another.  Accordingly,

defendants' motion to dismiss the trademark infringement claim will also be denied.

**B.      Counts 4, 5, 6, 7, 8, and 9 – Declaratory Judgment as to Shareholder's Agreement**

**1.      Choice of Law**

The dispute concerning the validity and applicability of the shareholder's agreement is a

matter of state contract law.  It is well-established that "[w]hen facing a claim that does not arise

under the Constitution or the laws of the United States, a federal court must apply the substantive

law of the forum in which it sits, including that state's conflict-of-laws provisions."  *Dykes v.*

*Depuy, Inc.*, 140 F.3d 31, 39 (1st Cir. 1998) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313

U.S. 487, 496 (1941)).   In interpreting contracts with a choice-of-law provision, Massachusetts

courts apply the law of the state designated in the contract unless the result would be contrary to

a fundamental public policy of Massachusetts.  *Feeney v. Dell*, 454 Mass. 192, 206 (2009).

Here, the shareholder's agreement includes a provision stating that it "is entered into under and

shall be governed by the laws of the State of Delaware."  (Compl. Ex. F, ¶ 8).  Plaintiffs do not

assert, nor can the Court deduce, any fundamental public policy that would be contravened by

applying Delaware law to the plaintiffs' claims as to the shareholder's agreement.  Accordingly,

the Court will apply the contract law of Delaware in determining whether those claims should be

dismissed.

2.      **Statute of Limitations**

The Delaware statute of limitations provides in relevant part:

No action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action.

10 Del. C. § 8106(a).[1]

Defendants contend that this three-year limitation period bars plaintiffs' claims that the

shareholder's agreement is invalid.  Plaintiffs, in response, contend that the invalidity claims are

not barred by the statute because they are, in effect, affirmative defenses to enforcement of the

contract asserted through the permissible vehicle of declaratory judgment claims.  Plaintiffs

contend that Geils did not raise these claims prior to this action because the contract was never

enforced and there was never any threat of enforcement by defendants.

It is indeed a well-established principle that parties are generally permitted to raise

defenses that, if raised as affirmative claims, would be time-barred.  *See City of St. Paul v.*

*Evans*, 344 F.3d 1029, 1033-1034 (9th Cir. 2003) (citing *United States v. Western Pac. R.R. Co.*,

352 U.S. 59, 72 (1956) ("To use the statute of limitations to cut off the consideration of a

particular defense in the case is quite foreign to the policy of preventing the commencement of

stale litigation."); *Luckenbach S.S. Co. v. United States*, 312 F.2d 545, 548-49 (2d Cir. 1963)

(permitting company to seek a declaratory judgment of non-liability in response to government

---

[1] Plaintiffs do not concede that the Delaware statute of limitations applies to their contract claims.  The Massachusetts statute of limitations period for contract claims is six years.  Mass. Gen. Laws ch. 260, § 2.  Because the contract at issue was entered into more than six years before the commencement of this action, the Court need not decide at this stage which statute of limitations is applicable.  The Court does note, however, that Massachusetts choice of law rules  depart "from the traditional rule of law that characterized limitations statutes as procedural and automatically applied the statute of limitations of the forum State," and "[adopt] instead a functional approach that treats the issue as a choice of law question, as stated in the Restatement (Second) of Conflict of Laws § 142." *Nierman v. Hyatt Corp.*, 441 Mass. 693, 695 (2004).

claim, even though the company's claim would be time-barred if it had sought "affirmative recovery").  The Court interprets the affirmative claim at the core of this suit as a claim for trademark infringement.  Defendants offer the shareholder's agreement as an absolute bar to that claim.  As a consequence, plaintiffs' claims with respect to the invalidity of the shareholder's agreement, although raised as "claims," effectively function as a defense to the enforcement of the agreement.  Plaintiffs seek no affirmative relief on the basis of these claims, other than the ability to raise an actual trademark infringement claim; plaintiffs seek no money damages on the basis of the shareholder's agreement or the negotiations that produced it.

Moreover, even if Delaware's statute of limitations operated to foreclose plaintiffs' contract *law* claims, a number of the claims concerning the invalidity or inapplicability of the shareholder's agreement are equitable.[2]  Defendants concede that Delaware courts interpret the statute of limitations as merely a "guide for determining whether equitable defenses bar an action as untimely."  (Mot. to Dis. at 13).  Indeed, the case that defendants cite for this proposition makes clear that "the limitations of actions applicable in a court of law are not controlling in equity."  *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982).  At this stage, accepting the facts as alleged, the Court cannot definitively conclude that the statute of limitations bars plaintiffs' claims as to the operation or validity of the shareholder's agreement.

Although the complaint is hardly a model of clarity or brevity, it lays out a number of ascertainable grounds that could support a finding that the terms of the shareholder agreement do not bar plaintiffs' claims.  Sorting through those claims is no simple task; the list of legal and

---

[2] At the very least, plaintiffs' estoppel and waiver claims are equitable claims.

equitable doctrines that plaintiffs invoke reads like a table of contents from a contracts textbook.[3] The complaint alleges a number of facts in varying degrees of detail that, if proved true, could prevent the shareholder agreement from operating to bar this suit on the basis of any one of the asserted invalidity arguments.  The Court will not, at this early stage, finely sift through the factual allegations to determine which specific allegations apply to which specific doctrines raised by plaintiffs as a basis for relief.  For the purposes of deciding the motion to dismiss, it is enough to note that the complaint alleges sufficient facts, if proved true, to support each of the asserted claims.

### 3.   Rule 9(b)

Defendants further contend that plaintiffs' allegations concerning duress and coercion must be pleaded with particularity under Fed. R. Civ. P 9(b).  Defendants cite *Associated General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983), for the proposition that the particularity requirement of Rule 9(b) applies to allegations of coercion and duress.  The Supreme Court's only mention of "particularity" in the cited case occurs in a footnote, where the Court appears to be, at the most, reaffirming the power of district courts to require specificity in complicated matters and scolding the court below for not having done so, thereby making appellate review more difficult.  *See id.* at 528, n. 17 ("Had the District Court required the Union to describe the nature of the alleged coercion with particularity before ruling on the motion to dismiss, it might well have been evident that no violation of law had been

---

[3] Plaintiffs apparently contend that the shareholder's agreement cannot be enforced under the doctrines of unconscionability, coercion, duress, laches, waiver, acquiescence, and estoppel.  To the extent that plaintiffs attempt to assert an independent claim based on the allegations that the contract is "an unreasonable, oppressive contract and/or a contract of adhesion," it appears that no such separate cause of action exists.  The Court will interpret those claims to be encompassed by the doctrines of unconscionability, duress, and/or coercion.

alleged . . . .  Certainly in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").  Notably, the Supreme Court makes no mention of Rule 9(b).  By its very terms, the rule applies to complaints "alleging fraud or mistake."  The Court will not, in the absence of clear precedent to the contrary, expand the reach of Rule 9(b)'s requirements to allegations of either duress or coercion in the context of contract formation.

Furthermore, even if the particularity requirements of Rule 9(b) were applicable to allegations of coercion and duress, the Court finds that the complaint would satisfy them.  As defendants point out, when Rule 9(b) applies, it requires that the "who, what, when and where details of the alleged [conduct]" be pleaded.  *Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*, 87 Fed. Appx. 227, 231 (3d Cir. 2003).  The complaint alleges that the duress and coercion involved pressure put on Geils by Wolf, Justman, and their attorneys after he expressed a desire to leave the band.  The complaint further alleges that this took place around September 10, 1982, in Boston at the Ritz-Carlton hotel.  These facts are sufficiently particularized to survive Rule 9(b) scrutiny if that rule were to be applied to the duress and coercion claims.

For the foregoing reasons, defendants' motion to dismiss the declaratory judgment claims with respect to the shareholder's agreement will be denied.

### C.      Validity of T&A as a Corporation

Plaintiffs further seek a declaratory judgment that T&A is not a valid corporation.  To the extent the claim is an attempt to obtain a judicial determination that would permit piercing of the corporate veil with respect to the other claims at issue, it is sufficient to survive a motion to dismiss.  The complaint alleges that T&A failed to file any documents with, or pay any fees to,

17

the State of Delaware from 1991 until 2012.  It further alleges that, since its inception in 1973,

T&A had never held an annual meeting, held a shareholder meeting, elected directors or officers,

or otherwise followed corporate formalities.  These facts, if proved true, could potentially

support a disregard of the corporate form if equity so requires.  *See, e.g., Microstrategy Inc. v.*

*Acacia Research Corp.,* 2010 Del. Ch. LEXIS 254 at *46 (Del. Ch. 2010) ("Specific facts a court

may consider when being asked to disregard the corporate form include: '(1) whether the

company was adequately capitalized for the undertaking; (2) whether the company was solvent;

(3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned

company funds; and (5) whether, in general, the company simply functioned as a facade for the

dominant shareholder.'") (internal citation omitted).  Accordingly, defendants' motion to dismiss

the declaratory judgment claim with respect to the validity of T&A as a corporate entity will be

denied.

> **D.      Counts 15, 16, 17, 18, 19, and 20 – Remaining State Law Claims[4]**

Defendants have not separately argued why each of plaintiffs' state law claims should be

dismissed, instead relying on the argument that subject-matter jurisdiction collapses if the Court

finds that the trademark claims should be dismissed.  As the foregoing analysis indicates, the

Court finds that the complaint alleges facts sufficient to permit the trademark dispute to survive a

Rule 12(b)(6) motion to dismiss.  Accordingly, the Court will not dismiss the supplemental state

law claims for lack of subject-matter jurisdiction.

---

[4] Plaintiffs make state law claims for unfair business practices under Mass. Gen Laws ch. 93A (Count 15); tortious interference (Count 16); accounting (Counts 17 and 18); and breach of fiduciary duty (Counts 19 and 20).

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, defendants' motion to dismiss is DENIED.


**So Ordered.**


                                        /s/ F. Dennis Saylor
                                        F. Dennis Saylor IV
Dated: March 12, 2013                   United States District Judge